**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **CHERYL LUKE** | : | |
| **AKA CHERYL MORGAN** | : | **CASE NO.: 1:17-CV-63** |
| c/o Gerhardstein & Branch Co. LPA | : | |
| 441 Vine Street, Suite 3400 | : | |
| Cincinnati, OH 45202 | : | **JUDGE:** |
| | : | |
| Plaintiff, | : | |
| | : | **COMPLAINT AND JURY DEMAND** |
| v. | : | |
| **Krys Lambert** | : | |
| **Individually** | : | |
| c/o Warren County Jail | : | |
| 550 Justice Dr. | : | |
| Lebanon, Ohio 45036 | : | |
| | : | |
| **And** | : | |
| | : | |
| **Andy Eby** | : | |
| **Individually** | : | |
| c/o Warren County Jail | : | |
| 550 Justice Dr. | : | |
| Lebanon, Ohio 45036 | : | |
| | : | |
| **And** | : | |
| | : | |
| **Jennifer Shockley** | : | |
| **Individually** | : | |
| c/o Warren County Jail | : | |
| 550 Justice Dr. | : | |
| Lebanon, Ohio 45036 | : | |
| | : | |
| **And** | : | |
| | : | |
| **Beverly Perkins** | : | |
| **Individually** | : | |
| c/o Warren County Jail | : | |
| 550 Justice Dr. | : | |
| Lebanon, Ohio 45036 | : | |
| | : | |
| **And** | : | |
| | : | |
| **Rashell Brickler** | : | |

1

**Individually**                              :
**c/o Warren County Jail**                    :
**550 Justice Dr.**                           :
**Lebanon, Ohio 45036**                       :
                                              :
                                              :
**And**                                       :
                                              :
**Val Randolph**                              :
**Individually**                              :
**c/o Warren County Jail**                    :
**550 Justice Dr.**                           :
**Lebanon, Ohio 45036**                       :
                                              :
**And**                                       :
                                              :
**Amanda Lacon**                              :
**Individually**                              :
**c/o Warren County Jail**                    :
**550 Justice Dr.**                           :
**Lebanon, Ohio 45036**                       :
                                              :
**And**                                       :
**DAVID JOHNSON, SERGEANT**                   :
**Individually**                              :
**c/o Warren County Jail**                    :
**550 Justice Dr.**                           :
**Lebanon, Ohio 45036**                       :
                                              :
**And**                                       :
**JOHN DOE**                                  :
**Individually**                              :
**c/o Warren County Jail**                    :
**550 Justice Dr.**                           :
**Lebanon, Ohio 45036**                       :
                                              :
          **Defendants.**                     :

## I. INTRODUCTION

1.      This civil rights action challenging Defendants' sexual abuse, physical abuse, and failure to provide adequate medical care to Cheryl Luke while she was incarcerated at the Warren County Jail in May of 2013.[1]  Within hours of her admission, Ms. Luke and others alerted the Jail that she suffered from epilepsy and needed her medication or she would suffer debilitating seizures. Defendants refused to provide Ms. Luke her anti-seizure medication which led to her suffering withdrawal from the medications and becoming debilitated by uncontrolled seizures. Defendant Jones and Doe took advantage of Ms. Luke while she was incapacitated and forcibly raped her.   Defendants Johnson and Doe used so much blunt force to rape her they shattered bones in her shoulder. While Ms. Luke was incapacitated by the lack of medical treatment and unable to defend herself from abuse, her jailers tased her, took away her clothing, shutoff the water to her cell, and forced her to drink from the toilet. After 11 days of inadequate medical treatment and abuse, she was sent to a psychiatric hospital.  As a result of her treatment at the Warren County jail, Ms. Luke suffered physical and mental injuries including trauma and a broken shoulder that needed to be surgically treated. Ms. Luke files this claim to seek fair compensation and make sure no one else is tortured at the Warren County jail.

## II. JURISDICTION

2.      Jurisdiction over the claims brought under the Civil Rights Act of 1871 is conferred on this Court by 28 U.S.C. §§ 1331, 1343 (3) and (4). Jurisdiction over the state law claims is conferred by 28 U.S.C. § 1367. Venue is proper in this division.

## III. PARTIES

---

[1] A prior case, *Luke v. Eby*, SDOH Case No. 15-288 was dismissed without prejudice on January 28, 2016 (Doc. 30).

3.      Cheryl Luke is a resident of Hamilton County, Ohio and a citizen of the state of Ohio.

Ms. Luke is also known as Cheryl Morgan and when she was under the protection of the Federal

Bureau of Investigation she was known as Trinity Payne.

4.      Defendant Krys Lambert, R.N., is duly licensed to practice nursing by and in the State of

Ohio.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted

under color of law. She is sued in her individual and official capacities. At all times relevant to

this case she was the Health Services Administrator for the Warren County Jail.

5.      Defendant Andy Eby, L.P.N., is duly licensed to practice nursing by and in the State of

Ohio. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted

under color of law. She is sued in her individual and official capacities.

6.      Defendant Jennifer Shockley, L.P.N, is duly licensed to practice nursing by and in the

State of Ohio. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this

case acted under color of law. She is sued in her individual and official capacities.

7.      Defendant Beverly Perkins, L.P.N., is duly licensed to practice nursing by and in the

State of Ohio. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this

case acted under color of law. She is sued in her individual and official capacities.

8.      Defendant Rashell Brickler, L.P.N., is duly licensed to practice nursing by and in the

State of Ohio. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this

case acted under color of law. She is sued in her individual and official capacities.

9.      Defendant Val Randolph, L.P.N., is duly licensed to practice nursing by and in the State

of Ohio. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case

acted under color of law. She is sued in her individual and official capacities.

10.      Defendant Amanda Lacon, L.P.N., is duly licensed to practice nursing by and in the

State of Ohio. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. She is sued in her individual and official capacities.

11.     Defendants Lambert, Eby, Schockley, Perkins, Brickler, Randolph, and Lacon are collectively referred to herein as "Defendant Nurses."

12.     Defendant David Jones is and was at all times relevant to this action an employee of Warren County, Ohio. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is sued in his individual and official capacities.

13.     Defendant John Doe is and was at all times relevant to this action an employee of Warren County, Ohio. Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. He is sued in his individual and official capacities.

## IV. FACTS

**A. Cheryl Luke**

14.     Ms. Luke is 38 years old. She lives in Cincinnati, Ohio currently.  She grew up in Southwestern Ohio.  In 2004, she moved to Colorado.

15.     While living in Colorado, she was being treated for anxiety, depression, epilepsy and other serious medical conditions.  In March 2013, her mental status was stable and she presented with no symptoms of psychotic processes or deterioration in mental status. Her epilepsy was controlled by medications such as Lyrica and Dilantin which she took several times a day.

16.      In April 2013, Ms. Luke learned there was a warrant for her arrest in Butler County, Ohio.  She made arrangements to travel from Colorado to Southwest Ohio to turn herself in to Butler County.  She brought her prescription medications with her.

17.     In April 2013, Ms. Luke turned herself into Butler County on an outstanding warrant for non-payment of child support.  She was incarcerated at the Butler County Jail from April 22,

2013 until May 1, 2013.

18.     Ms. Luke was detained at the Butler County jail on April 22, 2013. When Ms. Luke entered the Butler County jail her jailers knew she had medical conditions including epilepsy, fibromyalgia, cancer (which was in remission), a history of substance abuse, hypoglycemia, anxiety, and depression. Ms. Luke brought her prescription medications with her to jail in their prescription bottles from a pharmacy in Colorado. The medications were needed to treat her serious medical needs, including Lyrica which was needed to treat her epilepsy. She also brought to the Butler County jail Hyoscyamine to treat ulcers and Suboxone to treat opioid dependence. The Butler County jail confiscated her medications.

19.     Ms. Luke suffered from symptoms of depression at the Butler County jail. She was placed on suicide watch and given Librium to treat her depression. When Ms. Luke was released from the Butler County jail on May 1, 2013, the jail did not return her prescription medications or her prescription bottles.

20.     Ms. Luke filled her prescription for Lyrica and began taking it as soon as she was released.

21.     Ms. Luke learned there was an open warrant from Warren County and reported to Warren County Common Pleas Court on May 3, 2013 to turn herself in on a four year old warrant for deception to obtain drugs. She was under the impression she was not going to be incarcerated. However, the court ordered she be held at the Warren County Jail. She was admitted to the jail on May 3, 2013 at 8 a.m. without bond.

22.     At the jail, Ms. Luke was screened for medical conditions at intake on May 3rd and again by Defendant Perkins and another Defendant Nurse on May 4. She informed both medical screeners of her diagnoses, including epilepsy, post-traumatic stress disorder, battered woman

syndrome, and depression. She explained to both that she was taking Lyrica for her epilepsy and she had the prescription bottle with her. The screening nurse refused to provide her Lyrica because it was not allowed to be given at the WCJ. Ms. Luke warned both screeners that if she did not receive her Lyrica she would start to have convulsions. She asked for Dilantin instead, since that had also worked to control her seizures in the past. She was denied both medications. She provided the name of her treating doctor in Colorado who prescribed Lyrica. This information was all clearly documented in her chart and available to all nurses who treated or refused to treat her.

23.     No physical assessment was done by any Defendant.

24.     Defendants failed to give Ms. Luke any anti-seizure medications on May 3. Ms. Luke continued to ask for medical treatment that first day but treatment was denied.

25.     Later the afternoon of May 3, Ms. Luke felt pre-seizure symptoms such as confusion, inability to focus, staring, tunnel vision, déjà vu, and difficulty speaking. She told corrections and nursing staff how she was feeling and asked for her anti-seizure medications. She was denied medication.

26.     At least twice on May 3, Mrs. Luke spoke to her attorney's paralegal and reported she needed her anti-seizure medications. The paralegal called the Warren County jail twice asking that Ms. Luke's medications be provided. The jail said they were providing her medications. However, none were provided. Nor did the Defendant Nurses do a medical assessment or have Ms. Luke see a doctor.

27.     Ms. Luke sent a message to the jail's medical staff that begged, "I need my medications now or I will have a seizure and withdrawing [sic]." She was scheduled to see a nurse on May 4.

28.     On May 4, Ms. Luke requested her seizure medications and warned that she would have a

seizure if she did not get her medications. Defendant Shockley and a Defendant Nurse refused to provide her Dilantin or any other anti-seizure medication. Nor did the Defendant Nurses have Ms. Luke examined by a doctor.

29.     On May 5, Ms. Luke was given a mental health exam and again requested treatment for her seizure disorder. Her prior history of PTSD, battered wife syndrome, depression, prescription for Lyrica and current doctor were again documented. Her seizure disorder was documented as well as her history of being seizure free when receiving her seizure medication. The seizure medications that successfully treated her epilepsy included Dilantin and Lyrica. She was referred to a psychiatrist but was refused medications.

30.     While at the Warren County jail, all Defendant Nurses encountered Ms. Luke, were aware of her serious medical needs, but none treated her for her known serious medical needs, her obvious deteriorating condition, nor her epilepsy. Defendant Nurses denied Ms. Luke adequate medical treatment. Ms. Luke's condition began to deteriorate as early as May 3. She experienced serious epileptic seizures and withdrawal. Theses seizures were caused by Defendant Nurses withholding or denying Ms. Luke any anti-seizure medications.

31.     By May 7, Ms. Luke was exhibiting bizarre and abnormal behavior, was unable to communicate, and was not oriented. At times, she was unconscious and incoherent because of her untreated epilepsy and medical conditions. Defendants Lacon and Randolph examined her and denied her medical treatment. All Defendant Nurses knew of her deteriorating condition, incoherence, and unconsciousness. These conditions were caused by the Defendant Nurses withholding or denying Ms. Luke any anti-seizure medications.

32.     Defendant Nurses did not provide Ms. Luke with any anti-seizure medications from May 3 through May 7. The Defendants knew that since May 3 a) Ms. Luke suffered from epilepsy

and other chronic conditions that needed treatment, b) Ms. Luke had been prescribed medications to treat her epilepsy and other conditions; c) the name of Ms. Luke's doctor in Colorado but did not obtain his file or prescriptions; 4) Ms. Luke suffered from untreated epilepsy including experiencing symptoms of seizures, including absence seizures that can occur hundreds of time a day and cause her to appear as if she is staring into space without moving, staring and difficulty speaking; 5) Ms. Luke suffered withdrawal from anti-seizure medications including Lyrica, including dilated pupils, seizures, confusion, agitation, behavioral changes, mood changes, suicidal behavior, depression, anxiety and diarrhea; 6) that as a result of not receiving medical care, including anti-seizure medications and treatment, Ms. Luke was incoherent and unresponsive, was not able to get out of bed, and was ill; 7) that Ms. Luke was exhibiting bizarre behavior. Despite Defendants knowing that Ms. Luke was suffering from these serious medical needs, they refused to treat her or refer her to a doctor.

33.     Defendants knew that failure to treat epilepsy could cause prolonged seizures, brain damage, and even death. Defendants knew that Ms. Luke was showing signs of having absence seizures that can cause her to appear as if she is staring into space without moving. Defendants also knew that left untreated, absence seizures can increase and occur hundreds of time a day. Defendants also knew that withdrawal from anti-seizure medications such as Lyrica, especially abrupt withdrawal, increases the patient's risk of having seizures. Defendants knew that such seizures can be especially severe and very difficult to control. And that the seizures experienced during withdrawal may be stronger and more frequent than normal. Defendant nurses also knew that withdrawal of Dilantin or other anti-seizure medications could cause continuous epileptic attacks without return to consciousness, leading to possible severe brain damage and death. It is common knowledge that a patient with epilepsy should slowly taper off these anti-seizure

medications and not stop taking them until a new anti-seizure medication has started working. Seizures brought on by abrupt withdrawal can be treated immediately by restoration of the medication. Despite knowing these serious risks to Ms. Luke of withdrawal of her anti-seizure medications, Defendant Nurses did not restore her medication. Even though Defendant Nurses knew Ms. Luke was suffering serious symptoms of seizures they denied to appropriately treat her.

34. From May 3 to May 7, Ms. Luke suffered from her untreated epilepsy and other medical conditions. She received no anti-seizure medications. As a result, she suffered increased frequency of seizures, anxiety and depression.

35. Because Ms. Luke became so ill at the Warren County jail so quickly, she was not able to call her family or her lawyer. After not hearing from her for several days her family began to worry about her.

36. On May 7, the jail reported to the Court that Ms. Luke was too sick to attend her bond hearing.

37. On May 7, Defendants contacted the Butler County jail and learned that Ms. Luke entered the Butler County jail with a prescription of Lyrica but was not given Lyrica at the Butler County jail. Defendants contacted Ms. Luke's fiancé who confirmed that Ms. Luke suffered from epilepsy and took Lyrica and Dilantin to treat it. He also stated that Ms. Luke had not had a seizure in two years and that she had a Lyrica prescription filled at the local Walgreens pharmacy. Defendants evaluated Ms. Luke, found symptoms of having a seizures disorder, but nonetheless ruled out her having a seizure disorder. Defendants refused to refer Ms. Luke to a medical doctor for an evaluation.

38. While Defendants knew from Ms. Luke's pleas for help, third party corroboration, and

their documentation of Ms. Luke's symptoms that she was at great risk of having seizures if not immediately treated, they chose not to treat her. Nor did they consult a physician, have a physician evaluate Ms. Luke, send Ms. Luke to a psychiatrist, as was recommended, obtain Ms. Luke's treating physician's records, or obtain her Walgreens's records. The Warren County jail had on-call services of a physician 24 hours a day, seven days a week. Ms. Luke continued to rapidly and visibly decompensate.

39.     On May 7, the jail doctor, Dr. Tordilla, ordered medications for Ms. Luke. Included in his order was Tegretol, an anticonvulsant medication used to treat seizures, bipolar disorder, neuralgia and a variety of other mood disorders such as PTSD. He ordered the nursing staff to dispense 400 mg of Tegretol immediately and then 200 mg by mouth two times a day. Defendant nurses did not carry out these orders nor did they inform the doctor that the orders were not being followed.

40.     On May 8, Ms. Luke's attorney's paralegal attempted to visit her in jail but was refused. She demanded to speak to the Sheriff and told him that the jail was refusing Ms. Luke her anti-seizure medications and she was having seizures. The Sheriff allowed the paralegal to visit Ms. Luke.

41.     During Ms. Luke's "visit" with the paralegal, she was rigid, staring blanking straight ahead, unblinking and could not walk. A Black male and a White female corrections officer carried her to the visiting chair and forced her into a seated position. She appeared to be having a seizure in front of the paralegal. Ms. Luke was unresponsive. The male officer pried her clenched fingers apart and wrapped them around the visitor phone and raised the phone to her head. Ms. Luke was unable to communicate.

42.     After the paralegal left the jail, the Black male sergeant who carried Ms. Luke to

11

visitation, who was later identified as Sergeant David Johnson, chased after the paralegal into the

parking lot. He asked if she got anything out of inmate Luke. He appeared anxious and was

sweating and wiping his brow. The paralegal told Sgt. Johnson Ms. Luke said nothing because

Ms. Luke was having an epileptic seizure and needed medical care immediately. Sgt. Johnson

told her that was the medical department's job.

43.     On May 9, 2013 Ms. Luke was found naked in the shower room, staring, completely

unresponsive, unable to communicate, pupils dilated, mouth open, and her eyes were rolled back

in her head.

44.     As a result, Defendant Perkins sent Ms. Luke to a local hospital, Bethesda Arrow

Springs, and reported, falsely, that she was withdrawing from illegal drugs. Before the squad

could transfer her to the hospital, a body cavity search was performed to search for drugs. None

were found.

45.     No defendant provided the hospital with Ms. Luke's medical records, history of epilepsy,

her history of taking Lyrica to successfully treat epilepsy, or requests for Lyrica and Dilantin, or

the WCJ refusal to provide any anti-seizure medications. The hospital noted that Ms. Luke was

unresponsive, treated her for drug withdrawal, and released her back to the jail after an hour.

46.     Defendant Lambert informed the Major, falsely, that Ms. Luke had received seizure

medication at the jail since her admission. Lambert told the Major she believed that Ms. Luke

had not had a seizure on May 8 and was "playing us." Defendant Lambert did not have Ms.

Luke evaluated by the doctor or reveal the true medications that were given to Ms. Luke.

47.     Later that day Ms. Luke's attorney visited her and she was ill, unable to communicate,

and collapsed face first into the table. No medical care was provided to her at the jail. Instead, a

Sergeant had another body cavity search performed on Ms. Luke to see if she was carrying

illegal drugs.  None were found.

48.     Ms. Luke continued to be incoherent and unconscious at times due to her lack of epilepsy treatment.  She was unable to respond to commands and was tased by a Warren County officer.

49.     On May 10, Ms. Luke was still unresponsive.  She had sluggish speech, she was not oriented, her memory was impaired, she had visual hallucinations, she was motionless, confused, had loose thoughts, a flat affect, and was tearful.  She was at risk of suicide.

50.     On May 10, Ms. Luke was taken to another hospital, Atrium, because she had become unresponsive and was acting "strange" since May 7th.  At the time, Ms. Luke was not responding verbally, had a flat affect, and was agitated.  At times in the hospital she would just stare.  The hospital ran tests, include a urinalysis, which showed she had sperm in her urine. The hospital assessed her as having an altered mental status and a history of epilepsy. She was diagnosed with a urinary tract infection, agitation and depression and sent back to the jail with a prescription for an antibiotic to treat the acute UTI.

51.     After her return to the jail, Defendants did not provide Ms. Luke her medications. Although the Defendants had orders to give Ms. Luke 200 mg of Tegretol, an anti-seizure medication, by mouth twice a day, they failed to do so.  Nor did they provide her the necessary antibiotic.  When Ms. Luke was too decompensated to swallow the pills, the nurses did not alert the doctor to change the delivery or type of medication or have her transferred to a hospital to receive treatment.

52.     Over the next three days Ms.  Luke decompensated to the point she had become catatonic and psychotic.  She was suicidal. She was left naked in her cell. She was crying uncontrollably. She was given no medications.

53.     On the morning of May 14, Ms. Luke was found naked in her cell, crying and mumbling.

She asked for her mother to hold her.  The jail placed Ms. Luke in shackles, handcuffs and a belly chain and transferred her to Summit Behavioral Healthcare for evaluation.

54.     At Summit, Ms. Luke was diagnosed with psychosis induced by the trauma of the sexual assault she endured at the Warren County jail.  While at the WCJ, Ms. Luke decompensated to the point where she was mute, non-responsive, unable to take care of herself, and unable to eat or sleep.  With proper treatment of her epilepsy and trauma, her condition improved.  She was stable enough to be released on July 11, 2013.

**C. Ms. Luke was Raped at the Warren County Jail**

55.     During her incarceration at the Warren County jail, Ms. Luke's incoherence, lack of consciousness, and inability to communicate due to her untreated medical conditions, left her vulnerable and unable to defend herself from rape or sexual assault. On more than one occasion, Ms. Luke was raped by Defendant David Johnson and Defendant John Doe and at least one other corrections officer while she was locked in her cell.

56.     During the sexual assaults, the rapists held her face-down.  One sexual assault occurred when Ms. Luke was lying on her bunk on her stomach, naked.  Three officers were present.  At least two men climbed on her and raped her while she was face down.  During one sexual assault the officers used so much blunt force on her shoulder that the bone shattered.  During one sexual assault Ms. Luke had a seizure and bit her tongue, which would have been obvious to her attackers.

57.     While at Atrium, on May 10, a urine test was performed that identified sperm in Ms. Luke's urine.  Ms. Luke could not have had sperm in her urine except through sexual intercourse while incarcerated at the Warren County jail.  Any sexual encounter with her fiancé prior to her incarceration at the Warren County jail would have been distant in the past for sperm to still be

present over a week later.  In addition, such an encounter with her fiancé could not have produced sperm since her fiancé had had a vasectomy years earlier.

58.     The jail obtained Ms. Luke's Atrium medical records, which included the lab result that sperm was in her urine.  No Defendant nurse alerted security to this finding or took any actions to protect Ms. Luke from further sexual assault. The Health Services Administrator, Defendant Lambert, was aware of the lab tests Atrium ordered.  She seemed more concerned though, with the cost to the County of the number of lab tests Atrium recommended, and ordered fewer tests to be performed.

59.     Ms. Luke was only able to identify one of the men who sexually abused her, Defendant David Johnson.  She was not able to identify the others abusers.

60.     While Ms. Luke was in treatment at a rape crisis center, she was able to draw a sketch of her rapist.  The sketch closely resembled David Johnson.

61.     Ms. Luke did not consent to sexual contact, sexual conduct, sexual assault or rape.  Ms. Luke denies Defendant Johnson's claim that she consented.[2]

62.     During the rape, one of the assailants put so much force on her shoulder, the bone shattered.  Her orthopedic surgeon opined that the shoulder arose from blunt-force trauma consistent with a sexual assault.

63.     Her rapists attempted to hide their actions by covering her cell window with black garbage bags.  They were able to get away with this despite Ms. Luke being housed in allocation so she could be observed every 10 minutes because she was on suicide watch.

64.     Ms. Luke arrived at Summit on May 14 with evidence of sexual assault, including unexplained blood on her clothing. She was taken to a hospital for a rape exam but was

---

[2] Defendant Johnson raised as a defense to the first complaint that Ms. Luke gave consent.  *Luke v. Eby*, SDOH Case No. 15-288, Doc. 13, ¶ 92.

psychologically unable to be evaluated.

65.     The conditions of confinement in her cell were horrific: she was raped, her shoulder was shattered, she was left naked, covered in her blood and feces, without access to running water, forced to drink out of the toilet, and on at least one occasion tased.  She was so desperate for help she attempted to write on the cell wall, in her own blood, "God, please help me."

66.     The trauma of the sexual assault caused such psychological trauma to Ms. Luke to such an extent that she suffered flashbacks of prior spousal abuse, psychosis, was catatonic and became afraid of law enforcement officers in uniform.

67.     As a result of the sexual assault, she has been diagnosed with trauma including post-traumatic stress disorder and trauma induced psychosis from the sexual assault at the Warren County Jail and has undergone treatment for the trauma caused by sexual assault.

68.     Once the sexual assault was reported, Warren County Sheriff's Office investigated.  The Sheriff's Office did not collect forensic evidence from Ms. Luke's clothing, bed, or cell or the lab results identifying the sperm in Ms. Luke's urine.  Instead, the jail disposed of Ms. Luke's plastic mattress which would have contained DNA and other forensic evidence.  As part of the investigation, Defendant Lambert forged Ms. Luke's name on a medical release form to obtain her medical records by deception.  A Warren County Assistant Prosecutor relied on the Sheriff's investigation and did not conduct an independent investigation of the rape or conditions of confinement.  The Federal Bureau of Investigation investigated the sexual assault.  By the time the FBI became involved much of the forensic evidence was destroyed.   Upon information and belief, the FBI has been unable to gather sufficient forensic evidence to charge anyone as of the date of this filing.

**D. Defendant Nurses' Inadequate Care**

69.     Defendant Nurses Krys Lambert, Andy Eby, Jennifer Shockley, Beverly Perkins, Rashell Brickler, Val Randolph, and Amanda Lacon acted negligently, recklessly, wantonly, willfully, knowingly, intentionally and with deliberate indifference to the serious medical needs of Cheryl Luke.

70.     Defendants Nurses Krys Lambert, Andy Eby, Jennifer Shockley, Beverly Perkins, Rashell Brickler, Val Randolph, and Amanda Lacon were deliberately indifferent to the serious medical needs of Ms. Luke.

71.     Defendants Nurses Krys Lambert, Andy Eby, Jennifer Shockley, Beverly Perkins, Rashell Brickler, Val Randolph, and Amanda Lacon acted negligently, recklessly, wantonly, willfully, knowingly, intentionally and with deliberate indifference to the serious medical needs of Cheryl Luke.

72.     As a direct and proximate cause of Defendants' actions, Cheryl Luke suffered severe pain, humiliation, physical and psychological injuries, serious emotional distress.

## V.  FIRST CAUSE OF ACTION – 42 U.S.C § 1983

73.     Paragraphs 1 through 72 are incorporated herein.

74.     The Defendants, acting under the color of state law and with deliberate indifference, deprived Cheryl Luke of her rights, privileges and immunities secured by the Fourteenth Amendment to the U.S. Constitution including but not limited to the right to due process, the right to be protected, the right to have defendants intervene to protect her, the right to adequate medical care, and the right to be free from rape, excessive force, and outrageous conditions of confinement.

75.     Defendants Krys Lambert, Andy Eby, Jennifer Shockley, Beverly Perkins, Rashell Brickler, Val Randolph, and Amanda Lacon subjectively knew and perceived facts in their treatment and contacts with Ms. Luke to infer a substantial risk of harm to Luke if her epilepsy treatment was denied, withheld, or delayed, and if her anti-seizure medication was denied, withheld or delayed.  Defendants Krys Lambert, Andy Eby, Jennifer Shockley, Beverly Perkins, Rashell Brickler, Val Randolph, and Amanda Lacon drew these inferences and then disregarded the serous risks of harm to Ms. Luke.  Defendants Krys Lambert, Andy Eby, Jennifer Shockley, Beverly Perkins, Rashell Brickler, Val Randolph, and Amanda Lacon's actions proximately caused harm and injury to Ms. Luke.

## VI. SECOND CAUSE OF ACTION –42 U.S.C § 1983 – Denial of Medical Care for Shoulder

76.     Paragraphs 1 through 75 are incorporated herein.

77.     The blunt-force trauma to Ms. Luke's shoulder during the sexual assault created a serious medical need that was obvious.

78.     Defendants Johnson and Doe subjectively perceived facts during the sexual assault and battery to infer a substantial risk of harm to Ms. Luke if the battery continued or if treatment was not provided to her.

79.     Defendants Johnson and Doe drew those inferences and then disregarded the risk of harm to Ms. Luke.

80.     Defendants Johnson and Doe's actions proximately caused harm, physical injury and mental injury to Ms. Luke.

## VII. THIRD CAUSE OF ACTION —42 U.S.C § 1983 – Failure to Protect and Denial of Safety

81.     Paragraphs 1 through 80 are incorporated herein.

82.     Defendants Johnson and Doe's mistreatment and sexual assault upon Ms. Luke was an objectively serious threat to Ms. Luke's safety.

83.     Defendants Johnson and Doe subjectively ignored the excessive risk to Ms. Luke's safety.

84.     Defendants Johnson and Doe's actions proximately caused harm, physical injury and mental injury to Ms. Luke.

**VIII. FOURTH CAUSE OF ACTION – 42 U.S.C § 1983 –<br>Denial of Right to Be Free from Sexual Assault**

85.     Paragraphs 1 through 84 are incorporated herein.

86.     Defendants Johnson and Doe sexually assaulted Ms. Luke while acting under the color of law as corrections officers and while Ms. Luke was a pretrial detainee.

87.     Ms. Luke maintained a constitutional right to personal security and bodily integrity that extended to being free from sexual assault.

88.     Defendants Johnson and Doe's actions proximately caused harm, physical injury and mental injury to Ms. Luke.

**IX. FIFTH CAUSE OF ACTION –Ohio  State Law Claim for Battery**

89.     Paragraphs 1 through 88 are incorporated herein.

90.     Defendants Johnson and Doe's sexual assault and rape of Ms. Luke involved intentional and nonconsensual touching.

91.     Defendants Johnson and Doe's actions were manifestly outside the scope of their employment.

92.     Defendants Johnson and Doe's actions proximately caused harm, physical injury and mental injury to Ms. Luke.

## X. SIXTH CAUSE OF ACTION –42 U.S.C § 1983 – Failure to Intervene

93.     Paragraphs 1 through 92 are incorporated herein.

94.     Defendants Johnson and Doe knew that Ms. Luke was being sexually assaulted.

95.     Defendants Johnson and Doe had a realistic opportunity to do something to prevent the harm from occurring.

96.     Defendants Johnson and Does' failure to intervene proximately caused harm, physical injury and mental injury to Ms. Luke.

## XI. SEVENTH CAUSE OF ACTION –Ohio  State Law Claim Unauthorized Inducement of Privileged Medical Information

97.     Paragraphs 1 through 96 are incorporated herein.

98.     Defendant Lambert knew of the existence of Ms. Luke's patient-physician relationship with the providers/physicians listed on the medical releases Lambert used to obtain Ms. Luke's protected healthcare information.

99.     Defendant Lambert intended to induce those providers/physicians to disclose protected healthcare information about Ms. Luke.

100.    Defendant Lambert did not reasonably believe that the providers/physicians could disclose that information to her without violating the patient-physician privilege.

101.    Defendant Lambert's actions were manifestly outside of her official responsibilities or were done with malicious purpose, in bad faith, or committed in a wanton or reckless manner.

102.    Defendant Lambert's actions proximately caused Ms. Luke harm.

## XII. EIGHTH CAUSE OF ACTION –Ohio  State Law Claim for Privacy Tort

103.     Paragraphs 1 through 102 are incorporated herein.

104.    Defendant Lambert wrongfully intruded into Ms. Luke's private relationships with other providers when she forged Ms. Luke's medical release, where Ms. Luke lacked capacity to consent and did not consent.

105.    These acts would cause outrage, shame or humiliation to a person of ordinary sensibilities.

106.    Defendant Lambert's actions were manifestly outside of her official responsibilities or were done with malicious purpose, in bad faith, or committed in a wanton or reckless manner.

107.    Defendant Lambert's actions proximately caused Ms. Luke harm.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

A.  Award Plaintiff compensatory damages in an amount to be shown at trial;

B.  Award punitive damages against all Defendants in an amount to be shown at trial;

C.  Award Plaintiff reasonable attorney's fees, costs and disbursements;

D.  Award Plaintiff pre and post judgment interest;

E.  Grant Plaintiff such additional relief as the Court deems just and proper.

Respectfully submitted,


/s/Jennifer L. Branch
Jennifer L. Branch (0038893)
Trial Attorney for Plaintiff
Alphonse A. Gerhardstein (0032053)
Janaya Trotter Bratton (0084123)
Attorneys for Plaintiff
Gerhardstein & Branch Co. LPA
441 Vine St., Suite 3400
Cincinnati, Ohio 45202

Tel (513) 621-9100
Fax (513) 345-5543
agerhardstein@gbfirm.com
jbranch@gbfirm.com
jtbratton@gbfirm.com