UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CHERYL LUKE,

      Plaintiff,

                                Case No. 1:17-cv-63
    v.                          JUDGE DOUGLAS R. COLE

DAVID JOHNSON,

      Defendant.

## OPINION AND ORDER

During the spring of 2013, Cheryl Luke, the plaintiff in this action, was incarcerated in the Warren County Jail. The gravamen of her claim is that the sole remaining defendant in this action, David Johnson, who was a corrections officer at that facility, sexually assaulted her on one occasion during her incarceration. Johnson has now moved for summary judgment. (Doc. 102). As more fully set forth below, while there are some discrepancies in Luke's account of the alleged events, her testimony nonetheless suffices to create a genuine dispute of material fact as to her claim, and that account is not blatantly contradicted by the video evidence that Johnson provides. Accordingly, the Court **DENIES** the Motion (Doc. 102) as to the individual-capacity claims arising out of alleged sexual assault by Johnson. Because Luke has indicated that she will drop any remaining claims not arising out Johnson's alleged sexual assault, as well as any remaining official-capacity claims against Johnson, the Court **GRANTS** the Motion (Doc. 102) as to those claims.

1

## FACTUAL BACKGROUND

### A.  Luke Spends Eleven Days At The Warren County Jail.

In 2013, while living in Colorado, Luke was arrested on two Ohio warrants, one in Butler County and the other in Warren County. (Def. Ex. 1, Defendant's Proposed Undisputed Facts ("Def. Prop. Facts"), Doc. 102-1, #2593; *compare* Pl. Resp. to Def. Prop. Undisputed Facts (Pl. Resp)., Doc. 115, #3525). Luke was incarcerated in the Butler County Jail for approximately one week during April 2013. (Def. Prop. Facts, Doc. 102-1, #2593).[1] Luke was then incarcerated in the Warren County Jail ("the Jail") for about one and a half weeks beginning May 3, 2013. (*Id.* at #2594). Luke's time in the Jail ended on May 14, 2013, when she was transferred to Summit Behavioral Health ("Summit") to receive mental health care. (*Id.*).

At the start of her period of incarceration in the Jail, Luke was housed among the Jail's general population. (*Id.* at #2597). However, on May 7, Jail staff requested Luke's transfer to the Jail's booking department so that she could be on increased watch. (*Id.*). As a matter of policy, the Jail places inmates on increased watch when they need more constant supervision or if they are at risk of experiencing a medical emergency. (*Id.* at #2598). Luke's assignment to the booking department on increased watch continued until the end of her period of incarceration at the Jail on May 14. (*Id.* at #2597). Luke's claim in this action relates to this eight-day period she spent in the booking department of the Jail.

---

[1] The Court has in each instance compared Defendant's Proposed Undisputed Facts with Plaintiff's Response to Defendant's Proposed Undisputed Facts to determine which facts are undisputed. For convenience, the Court cites only the former document here and following.

The booking department of the Jail contains three holding cells. (*Id.* at #2594). Cell 2 is a larger cell that can hold up to six individuals; cells 1 and 3, by contrast, are identical single cells. (*Id.* at #2594–95). Holding cells 2 and 3 are located across from the booking counter. (*Id.* at #2595). Holding cell 1, though, is located at the end of a hallway leading behind the booking counter. (*Id.*).

Three video cameras monitor the booking department. (*Id.* at #2596). However, Johnson relies on the footage from only a single camera, Camera A, in support of the instant motion. (*Compare* Def. Mot. for Summ. J., Doc. 102, #2559, *with* Pl. Resp., Doc. 115, #3530). At argument, Johnson explained that is because the other two cameras have limited storage, and frequently "overwrite" existing video with new video. Here, by the time Luke pressed her claims, footage from the other cameras during the relevant time period was no longer available. Footage from Camera A does not capture the interior of holding cell 1. (Compare Def. Prop. Facts, Doc. 102-1, #2596 ("From Camera A one can also see anyone who walks in the direction of cell 1."), *with* Pl. Resp., Doc. 115, #3530 ("booking Cell 1 is not on video …")). Holding cells 2 and 3 are visible from Camera A. (Def. Prop. Facts, Doc. 102-1, #2596).

When she was transferred to increased watch on May 7, Luke was initially housed in holding cell 3. (*Id.* at #2598). Luke subsequently spent periods of time housed in both holding cell 1 and holding cell 3 during her period of incarceration in the booking department of the Jail. (*See, e.g., id.* at #2604, 2606, 2612).

**B.**     **Johnson Interacts With Luke In Her Cell.**

Johnson worked as a relief supervisor in the Jail in May 2013. (*Id.* at #2597).
During the eight-day period relevant here, Johnson worked from time to time in the
booking department. This included, on occasion, interacting with Luke.

In her Amended Complaint (Doc. 5), Luke originally alleged that Johnson and
at least two other corrections officers sexually assaulted her "on more than one
occasion" during her time in the booking department. (Am. Compl., Doc. 5, #43). But
Luke was noncommittal on when during that time period the alleged assaults
occurred.

In fairness to Luke, that may have been due to issues outside her control. Luke
suffers from severe epilepsy, and she has also received treatment for anxiety and
depression. (Luke Dep., Doc. 91-8, #634, 778). During her period of incarceration at
the Jail, Luke had displayed erratic and troubled behaviors for which she received
medical attention both inside and outside the facility. That may have resulted in part
from a lapse in Luke's anti-seizure medication, combined with the possibility
(according to Luke) that when Luke did resume such medication, it was Tegretol
rather than Dilantin or Lyrica, the drugs she was accustomed to taking. (Pl. Resp. in
Opp. ("Pl. Opp."), Doc. 112, #3439–3440). But the Court also notes that Johnson
disputes whether Luke took Tegretol at the jail, citing Luke's deposition testimony
that she does not remember doing so. (Def. Repl. in Supp. of Mot. for Summ. J. ("Def.
Repl."), Doc. 120, #3586 (citing Luke Dep., Doc. 91-8, #979, 989)). In any event, Luke
was first placed on increased watch, and thus transferred to the booking department,

4

due to her "bizarre behavior" at 1:36 a.m. on May 7. (Def. Prop. Facts, Doc. 102-1, #2597–98).

As noted above, Luke originally alleged multiple assaults by multiple assailants. By the time summary judgment arrived, though, Luke had dropped her claims against all other defendants in this action (*see* Doc. 81), and she was alleging assault only against Johnson. Because Luke had still failed to pinpoint the time when the alleged assault occurred, in support of the instant Motion for Summary Judgment, Johnson painstakingly documents every instance in which the two are in each other's presence during the entire eight-day period. The only time it appears that the two were together for any extended period of time, yet off camera, was an approximately two-and-a-half-minute period on May 8, 2013. Perhaps not surprisingly, Luke now claims that is when the assault occurred.

On that day, the video shows that Johnson and a female corrections officer moved Luke from holding cell 3 to holding cell 1. (Def. Prop. Facts, Doc. 102-1, #2601–02). At 1:22 p.m., Johnson went down the hallway to holding cell 1, followed by a female corrections officer about thirty seconds later. (*See* Defendant's Exhibit 38 ("Def. Ex. 38"), Clip 7 13:22:40–13:24:28). Johnson and the officer took Luke out of the booking department. (*See id.*). At 1:31 p.m., Johnson took Luke back to holding cell 1. (*Id.*). Johnson returned from holding cell 1 at 1:34 p.m. (*See* Def. Ex. 38, Doc. 100, Clip 8 13:31:43–13:34:10). For the two-and-a-half minutes after Johnson and Luke entered cell 1 until Johnson returned to view, neither Johnson nor Luke was visible from Camera A. (*See id.*). As noted, this was their only known off-camera

5

interaction during Luke's stay in the booking department. (Pl. Resp., Doc. 115, #3542).

**C.    Luke Receives Medical Care And Sperm Is Found In Her Urine.**

On May 9, the day after the day on which Luke now claims the alleged assault occurred, Luke became unresponsive while in the shower area, displaying fixed and dilated pupils. (Def. Prop. Facts, Doc. 102-1, #2604). Luke was transported to Bethesda Arrow Springs Hospital ("Bethesda Hospital") at about 4:30 a.m. (*Id.* at #2605). Part of the diagnostic work-up the hospital performed included a urinalysis. (*Id.*). That urinalysis did not detect the presence of any sperm.[2] Based on the testing conducted on Luke, the treating physicians diagnosed Luke with "conversion reaction." *(Id.*). Luke returned to the Jail that day.

As alluded to above, the incident that led to Luke's transport to Bethesda Hospital was merely one instance of a series of odd behaviors. For example, on several occasions during her time in the booking department, Luke stood naked at the door of holding cell 1. (*Id.*). At some point during her time there, although the parties dispute exactly when, corrections officers taped trash bags over the window. (*Compare id.,* at #2609, *with* Pl. Resp., Doc. 115, #3550). While they disagree on the exact date, they agree that the trash bags were placed over the windows of holding cell 1 in order to prevent others from seeing Luke in the nude. (Def. Prop. Facts, Doc. 102-1, #2609).

---

[2] A urinalysis is not meant to test for the presence of sperm. At the same time, as discussed below, if sperm is present in a patient's vagina, a urinalysis catheter can sometimes transport sperm into the bladder, in which case its presence may be detected in a urinalysis.

These and other instances of Luke's behavior led the medical staff of the Jail to arrange for Luke to be transported to Atrium Emergency Room on May 10 (the day after her trip to Bethesda Hospital). (*Id*. at #2610). Atrium ran various medical tests on Luke including a head CT scan, blood work, and another urinalysis. (*Id*. at #2612). For the urinalysis, Nurse Shannon Burkhart collected Luke's urine sample using a catheter. (*Id*. at #2613). This time, the test revealed the presence of sperm in Luke's urine. (*Compare* Pl. Resp., Doc. 115, #3567, *with* Def. Prop. Facts, Doc. 102-1, #2616). Nurse Burkhart did not observe any injuries to Luke's genital area and did not request a SANE (sexual assault) examination for Luke. (Def. Prop. Facts, Doc. 102-1, #2613).

Luke returned from Atrium to the Jail that same day. (*Id*.). Four days later, on May 14, 2013, Luke was transferred to Summit for additional behavioral health treatment. (Def. Prop. Facts, Doc. 102-1, #2615).

**D.  Luke Alleges That Johnson Sexually Assaulted Her.**

A few days after Luke's arrival at Summit, Summit personnel called Johnson to inform him that Luke's criminal legal counsel had requested a rape kit due to a finding of sperm in Luke's urinalysis. (Def. Prop. Facts, Doc. 102-1, #2615; Pl. Resp., Doc. 115, #3560). Johnson notified Barry Riley, the Warren County Jail Administrator. (Def. Prop. Facts, Doc. 102-1, #2616). Riley instructed Johnson to notify the Warren County Sheriff's Office and ask them to open an investigation, and Johnson did so. (*Id*.). The investigation was assigned to Detective Paul Barger, who interviewed Luke some months later, on August 6, 2013, along with Detective Brandy

Carter. (*Id*. at #2617). Luke told Barger she was sexually assaulted at the Warren County Jail. (*Id*.). Barger also reviewed jail video of Luke, Luke's medical records, and her increased watch log records. (*Id*. at #2618). Barger also interviewed Johnson. (*Id*.). Barger ultimately closed Luke's case, and no criminal charges were brought against any officer for assaulting Luke. (*Id*. at #2619).

The parties dispute how Luke first learned of the presence of sperm in her urine sample collected at Atrium. While her criminal defense counsel learned of the result shortly after Luke arrived at Summit, it is not clear that Luke also learned at that time. Johnson maintains that Luke learned of the test result when she was transferred to the University of Cincinnati Hospital ("U of C Hospital") for a SANE exam on May 20. (Def. Prop. Facts, Doc. 102-1, #2616). But Luke says there is no evidence of any discussion with U of C Hospital providers regarding the sperm finding, and that she does not remember engaging in any such conversation. (Pl. Resp., Doc. 115, #3561; Luke Dep., Doc. 91-8, #768). Nevertheless, the parties agree that at the U of C Hospital examination on May 20, Luke denied any sexual assault, was not observed to have any physical injuries, and did not receive a SANE examination or submit to a rape kit. (Def. Prop. Facts, Doc. 102-1, #2617).

## E.  Luke Sues Johnson And Others Based On Her Treatment While At The Warren County Jail.

Luke first sued Johnson (and numerous other defendants) roughly two years later on May 1, 2015. In her original Complaint, Luke asserted various counts, only some of which pertained to Johnson. Claims against Johnson included deliberate indifference to Luke's serious medical needs, deliberate indifference to Luke's safety,

8

violation of Luke's substantive right to be free from sexual assault, tortious battery, and failure to intervene. (*See* No. 1:15-cv-00288, Compl., Doc. 1, ¶¶ 50–76, #6–8). On January 28, 2016, all parties to that suit agreed to a stipulated dismissal without prejudice. (Stip., Doc. 30, #147–48).

On January 27, 2017, Luke filed the instant suit. She named the same defendants, this time suing them in both their individual and their official capacities, asserting many of the same claims. (Compl., Doc. 1). Against Johnson, Luke's claims included denial of medical care, failure to protect and denial of safety, denial of right to be free from sexual assault and excessive force, battery, and failure to intervene. (*Id.* at ¶¶ 81–96, #18–20). On February 1, 2017, Luke filed an amended complaint asserting similar claims against the same defendants. (Am. Compl., Doc. 5, ¶¶ 73–92 #47–49). But, as noted above, on February 6, 2020, Luke moved to drop all defendants other than Johnson, and on February 28, 2020, the Court granted that motion. (Mot. to Drop, Doc. 81; Order granting Mot. to Drop, Doc. 82).

At her deposition on November 4, 2019, Luke provided the following account of the alleged assault: although she could not remember the date on which it occurred, Luke remembers that she woke up in her holding cell and felt pressure on the back of her right collarbone and in the back of her shoulder blade. (Luke Dep., Doc. 91-8, #622). Luke had mucous coming out of her nose. (*Id.*). Luke lifted her head up and saw two sets of feet by the door of her cell and then saw Johnson. (*Id.*). Luke passed out for a moment. (*Id.*). Luke felt vaginal penetration and saw Johnson standing over her. (*Id.*). Luke stated that the two corrections officers whose feet she saw "were

blocking the door." (*Id.* at #624). Luke heard voices of two or three men, but recognized only Johnson. (*Id.*). The incident lasted twenty to thirty more seconds after Luke woke up. (*Id.* at #626). Luke testified that she did not know whether anyone ejaculated into her vagina, a fact that may be relevant as the urinalysis at Atrium detected sperm. (*Id.* at #625).

Also during discovery in this action, on August 3, 2020, Luke submitted a report from Dr. Ayman Mahdy regarding the procedures that Atrium used to take and examine Luke's urine sample. (Mahdy Decl., Doc. 104-3). Dr. Mahdy is a urologist and associate professor of urology currently serving as the medical director of urology services at West Chester Hospital. (*Id.*). Based on Burkhart's account from her deposition, Dr. Mahdy's report concludes that Burkhart used the proper technique to avoid external contamination of Luke's urine sample and that the sample was therefore reliable. (*Id.* at #2820). Dr. Mahdy also concludes that the lab technician, Michael Peppas, properly analyzed the sample to contain sperm, again based on Peppas's deposition. (*Id.*). Dr. Mahdy's report further opines that sperm in female urine is "not a normal finding," and that one possible source of sperm in female urine is the presence of sperm in the vagina or labia, such as could occur after sexual intercourse. (*Id.* at #2819). Dr. Mahdy's report also suggests that the absence of sperm in Luke's urine sample taken May 9 at Bethesda Hospital does not rule out recent sexual intercourse or presence of sperm in her vagina at that time. (*Id.* at #2820). Dr. Mahdy's report does not include any independent review of Atrium's policies and procedures for collecting and analyzing urine samples. (*See generally id.*; *see also* Def.

Obj., Doc. 117, #3572). Rather, Dr. Mahdy relies on his experience and review of the medical literature to compare the deposition testimony of Burkhart and Peppas with his understanding of the proper procedure for taking and analyzing a urine sample. (Mahdy Decl., Doc. 104-3, #2818).

**F.    Johnson Moves For Summary Judgment.**

On October 19, 2020, Johnson filed the instant Motion for Summary Judgment. (Doc. 102). He argues that the video footage from Camera A blatantly contradicts Luke's account of sexual assault. (Def. Mot. for Summ. J., Doc. 102, #2576). For this reason, Johnson argues that, despite Luke's testimony, there is no genuine dispute of material fact as to whether Johnson sexually assaulted Luke. (*Id.* at #2575). Johnson also argues that the urinalysis result is "inconclusive" and therefore inadmissible evidence that should not be considered on summary judgment. (*Id.* at #2579–80).

On November 24, 2020, Luke filed her opposition to Johnson's Motion. (Doc. 112). In her response, Luke indicated that she would drop her claims against Johnson that are based on conditions of confinement, failure to intervene, failure to protect, and denial of medical care. (*Id.* at #3446 n. 3). Luke's remaining claims of denial of the right to be free from sexual assault, excessive force, and battery all stem entirely from Johnson's alleged sexual assault of Luke. (*See id.*). On December 8, 2020, Johnson both replied in support of the instant Motion and objected to the consideration of Dr. Mahdy's Report under Federal Rule of Civil Procedure 56(c)(2). (Def. Repl., Doc. 120; Def. Obj., Doc. 117). The Court heard oral argument on September 9, 2021.

11

## LEGAL STANDARD

To prevail on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Morehouse v. Steak N Shake*, 938 F.3d 814, 818 (6th Cir. 2019) (quotation omitted); Fed. R. Civ. P. 56(a). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket omitted) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48 (1986)). A "scintilla" of evidence is not enough; "the evidence must be such that a jury could reasonably find for the plaintiff." *Mich. Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994). However, "[t]he party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact." *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted).

Summary judgment is not the place for "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," which should instead be left for the jury at trial. *Anderson*, 477 U.S. at 255. Accordingly, inferences to be drawn from the record must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold*, 369 U.S. 654, 655 (1962).

Pursuant to Federal Rule of Civil Procedure 56(c)(2), a party may object that a fact is not supported by evidence that could be presented in a form admissible at trial. Fed. R. Civ. Pr. 56(c)(2). However, evidence need not already be presented in such form to be considered on summary judgment, so long as it could be presented at trial in a form that would be admissible. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## ANALYSIS

### A.   The Court May (And Does) Consider Luke's Urinalysis Results From Atrium And Dr. Mahdy's Report In Deciding The Instant Motion.

As an initial matter, the Court must decide whether to consider the May 10 urinalysis results from Atrium showing sperm in Luke's urine in connection with the motion for summary judgment. The Court must also decide whether to consider Dr. Mahdy's expert report in support of the reliability of the techniques used to collect and test the sample. Johnson argues that the former is "inadmissible" and that the latter should be "disregarded." (*See* Def. Mot. for Summ. J., Doc. 102, #2580; Def. Obj., Doc. 117, #3572). Regarding the urinalysis result, Johnson argues that it is "inconclusive" because the test does not show the source of the sperm or how long it was present in Luke's urine, nor does the urinalysis confirm that Luke was sexually assaulted. (Def. Mot. for Summ. J., Doc. 102, #2580). Regarding Dr. Mahdy's report, Johnson argues that the report lacks a sufficient basis in fact under Federal Rule of Evidence 702 because Dr. Mahdy is not a lab technician and neither personally observed the collection and testing of Luke's urine sample nor reviewed Atrium's policies and procedures. (Def. Obj., Doc. 117, #3572).

The Court concludes that both the urinalysis result and Dr. Mahdy's expert report are appropriate for consideration at the summary judgment stage. Beginning with the urinalysis result, Johnson's attacks on its supposed shortcomings miss the mark. The urinalysis did not seek or purport to determine either the source of sperm, the length of time sperm had been present in Luke's body, or the probability that anyone sexually assaulted Luke. Rather, Luke relies on it simply as evidence that sperm was present in Luke's body shortly after the alleged sexual assault. Luke then argues that a reasonable jury could infer from the presence of sperm, coupled with the difficulty of identifying an alternative source for the sperm, that sexual assault by Johnson was the source of the sperm. (*See* Pl. Opp., Doc. 112, #3541–3543). The Court expresses no opinion on the merits of that inference, or even on whether the test in fact accurately reported that result. The point is merely that Johnson has failed to show that the urinalysis result is wholly unreliable, and, as such, that result is at least probative evidence of the *presence* of sperm in Luke's body shortly after the alleged sexual assault. Defendant does not seriously dispute that. And it would be difficult to deny that the presence of sperm tends to make it at least more likely (which does not mean likely) that Johnson had sexually assaulted Luke as she alleges. Johnson therefore has not shown that the urinalysis result is anything other than relevant, admissible evidence appropriate for consideration at this stage.

In support of his characterization of the urinalysis result as "inconclusive," Johnson relies on the Sixth Circuit's decision in *Friedrich v. Echols*. No. 91-3929, 1992 WL 233902, *6 (6th Cir. 1992). There, the Sixth Circuit held that a trial court did not

abuse its discretion when it excluded the results of a polygraph test based on the examiner's conclusion that the test results were "'inconclusive, the same as no test being given at all.'" *Id.* at *6. But Johnson cannot, and does not, argue that the urinalysis in this case was "inconclusive" in the sense of being "the same as no test being given at all." Rather, the urinalysis in this case revealed the presence of sperm in Luke's urine, a fact that would not have been apparent in the absence of the urinalysis. By the same token, as Luke notes, the test result in *Myles v. Lafler* was "inconclusive" in the sense of failing to provide reliable evidence as to whether or not gunshot residue was present on the defendant's person. (*See* Pl. Opp., Doc. 112, #3452 (citing *Myles v. Lafler*, No. 2:06-cv-14101, 2012 WL 1021720, at *7 (E.D. Mich. Mar. 27, 2012))). Again, Johnson here does not argue that the urinalysis result in this case is "inconclusive" in that sense, nor, as noted, does he point the Court to any facts that would cast doubt on its reliability. Because the urinalysis result is at least probative evidence of the presence of sperm in Luke's body two days after the alleged sexual assault, it is relevant evidence that tends to make a material fact more likely (which, again, is not the same as likely). Johnson has not shown that it is otherwise inadmissible. The Court will therefore consider the urinalysis result as part of the record on summary judgment.

Turning to Dr. Mahdy's report, the Court also finds Johnson's objection unpersuasive. Johnson cites no legal authority, and the Court is aware of none, for the proposition that an expert who opines on the reliability of the procedures used to collect or test a given medical sample must review the policies of the institution where

the test took place, much less that the expert must personally observe the collection or analysis as Johnson seems to suggest. (Def. Obj., Doc. 117, #3572). Here, Dr. Mahdy instead relied on the deposition testimony of Burkhart and Peppas regarding the procedures they used to collect and test Luke's urine sample. Johnson identifies nothing inherently inappropriate about such reliance for purposes of expert testimony. Moreover, although Johnson notes that Dr. Mahdy "never ran or supervised a lab," Johnson fails to explain why this fact renders Dr. Mahdy incompetent to opine as to whether a given lab procedure passes muster. (*Id.*). Dr. Mahdy has practiced as a urologist and professor of urology for decades. (Mahdy Decl., Doc. 104-3, #2822). The Court sees no reason at present to disregard Dr. Mahdy's report and will consider it as part of the record on summary judgment.[3]

## B. Luke's Testimony, If Not Disregarded, Creates A Genuine Dispute Of Material Fact As To Whether Johnson Sexually Assaulted Luke.

The central question presented by Johnson's Motion is whether there is a genuine dispute of material fact regarding Luke's claims. The Court has little difficulty identifying the most important factual dispute between the parties—Luke contends that Johnson sexually assaulted her on May 8 between 1:31 and 1:34 p.m., and Johnson denies that he ever sexually assaulted Luke. To call this dispute material would be an understatement. If a jury were to credit Luke's sworn testimony that Johnson sexually assaulted her, she would likely win her case. If, by contrast,

---

[3] Johnson remains free to voir dire Dr. Mahdy at trial, and if the doctor lacks a sufficient expertise regarding laboratory procedures, the Court will exclude that evidence at trial. Based on the paper record at summary judgment, though, the opinion passes muster.

the jury were to credit Johnson's testimony, Luke's case would be doomed. In short, the outcome here largely turns on assessing the comparative credibility of the two witnesses, a task assigned solely to the province of the jury.

Even if the competing accounts themselves were not enough, Luke also points to the urinalysis finding of sperm, coupled with the alleged difficulty of identifying another source of the sperm, as support for her case. (Pl. Resp., Doc. 115, #3449–53). And, Luke's Response to Johnson's Proposed Undisputed Facts also includes reference to other facts—Johnson's act of discarding Luke's mattress, the possibility that trash bags were covering the windows of Luke's cell when Johnson and Luke were there together, the fact that Johnson testified that he could not remember where he was with Luke when he took her out of booking, and Luke's alleged vulnerable condition partly induced by the Tegretol medication—as further support for her case. (Pl. Opp., Doc. 112, #3450; Pl. Resp., Doc. 115 #3550, 3542, 3559). For his part, Johnson has competing explanations on each of these fronts.

The Court need not address, though, whether this other evidence, in and of itself, would suffice to create a genuine dispute. Luke's testimony that Johnson sexually assaulted her is the central piece of evidence that would ordinarily suffice on its own to survive summary judgment. Accordingly, so long as the Court does not entirely discount Luke's testimony, there is a genuine dispute of material fact that precludes summary judgment. Indeed, Johnson does not really dispute that point. Rather, he contends that the Court *should* entirely discount Luke's account. That is the issue to which the Court turns now.

17

**C.  Video Evidence Does Not Blatantly Contradict Luke's Claim That Johnson Sexually Assaulted Her.**

While acknowledging that competing eyewitness accounts typically create a genuine dispute of material fact, Johnson argues that there is an exception to that rule. In particular, he argues that a court can reject a witness's version of events where video evidence "blatantly contradicts" the witness's statement. And here, he argues, the video footage from Camera A "blatantly contradicts" Luke's claim that Johnson sexually assaulted her. (Def. Mot. for Summ. J., Doc. 102, #2576–79). The Court disagrees.

Johnson's argument starts on firm legal footing. The Supreme Court has held that, where a party's account is "blatantly contradicted" by video footage, "so that no reasonable jury could believe it," a court should not adopt that version of events for summary judgment purposes. *Scott v. Harris*, 550 U.S. 372, 380 (2007). But "blatantly contradicted" is a fairly high standard. Caselaw suggests, for example, that an important consideration in making that determination is whether the witness's account relates to events *depicted in the video footage itself*. For example, in *Scott v. Harris*, the material factual issue concerned whether the plaintiff, a criminal suspect in a high-speed chase, "was driving in such fashion as to endanger human life," such that an officer's decision to ram his bumper into the suspect's vehicle was objectively reasonable. 550 U.S. at 380. The video footage there blatantly contradicted the plaintiff's self-serving characterization of his driving because it showed (on-camera) how the plaintiff was driving at the time in question. Similarly, the leg-sweep maneuver that formed the basis for the Eighth Amendment excessive force claim in

18

*Griffin v. Hardrick* occurred on-camera, as did the events that formed the basis for the officer's good-faith defense, and it was footage of these events that contradicted the plaintiff's allegation of excessive force. 604 F.3d 949, 954 (6th Cir. 2010). So far as the Court can tell, Johnson has cited no case in which video footage "blatantly contradicted" a plaintiff's narrative *as to events not captured in that footage. See Shreve v. Franklin County, Ohio*, 743 F.3d 126, 135 (6th Cir. 2014) (video footage showed officers tried to handcuff suspect several times before using taser); *Pennington v. Terry*, 644 F. App'x 533, 534 (6th Cir. 2016) (video from officer's dashboard camera "clearly depict[ed] all of the material facts").

This is not to say that video footage could never blatantly contradict a party's account as to events *not* depicted in that footage. For example, in a given case, it might be that the events the video footage does capture render a party's account of what happened off-camera a physical impossibility. To use an example related to the facts here, if an inmate claimed that an officer caused off-camera physical injuries obviously inconsistent with the inmate's bodily condition evidenced in video footage immediately after the alleged injuries occurred, a court might be justified in disregarding the inmate's testimony to such injuries for summary judgment purposes. Imagine, for example, that an inmate claims that an officer sliced the inmate's right forearm with a knife off camera, but on-camera footage captured shortly after the alleged event clearly depicts the inmate's right forearm, and there is no wound present. But even then, caselaw suggests that the standard is high—disregarding the inmate's account is justified only when it is clear that the video

19

footage would have captured the alleged injuries had they occurred. *See Germain v. Gilpin*, No. TDC-18-0846, 2019 WL 1433019, at *8 (D. Md. Mar. 29, 2019) (absence of pepper spray in video footage of inmate's body immediately after alleged incident insufficient for summary judgment where evidence did not establish pepper spray would necessarily have been visible on video). In other words, video evidence "blatantly contradicts" a party's account of what occurred off camera, only if what is depicted on the video footage is necessarily inconsistent with that account.

A second, related principle also comes into play on the facts here. According to the Sixth Circuit, "that a recording blatantly contradicts a party's *exact* version of the events, or certain parts of his version, is not alone fatal at summary judgment. A recording must blatantly contradict a party's *entire* version of events in material respects to each claim." *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 527 (6th Cir. 2018). Accordingly, "[e]ven if part of a party's testimony is blatantly contradicted by an audio or video recording, that does not permit the district court to discredit his entire version of the events." *Id.* (quoting *Coble v. City of White House*, 634 F.3d 865, 870 (6th Cir. 2011)). In *Hanson* itself, for example, the Sixth Circuit concluded that video footage did not "blatantly contradict" the plaintiff's *entire* narrative that officers' use of pepper spray during a one-minute interaction in his jail cell was gratuitous because the cause of his cell door opening was not fully visible to the camera, even though the footage captured much of what happened and contradicted parts of his story. *Id.* at 536. Similarly, in *Green v. Throckmorton*, the Sixth Circuit determined that video footage did not blatantly contradict a plaintiff's account of

arrest without probable cause during a traffic stop in part because the video did not "clearly depict" the plaintiff's performance on sobriety tests the officer administered. 681 F.3d 853, 859, 865 (6th Cir. 2012).

The combination of those two principles dooms Johnson's efforts to establish a blatant contradiction here. Johnson concedes that he and Luke were alone and off camera for approximately two-and-a-half minutes. In other words, the key events occurred off camera, creating a hurdle for his blatant-contradiction argument right from the start. And there is no obvious or inherent contradiction between the sexual assault that Luke claims occurred off camera, and what is depicted on camera. To be sure, a jury would need to find that a lot of things happened quickly during that short period of time, and that Johnson composed himself quickly after the alleged event, but what is depicted on camera does not render the central aspects of Luke's account impossible.

Johnson tries to overcome that problem by pointing to several inconsistencies between Luke's story and what *is* depicted. For example, while Luke claimed she saw two sets of boots in the doorway, the video shows that no one is standing in the doorway during the key two-and-a-half-minute stretch here. (Def. Mot. for Summ. J., Doc. 102, #2579; Def. Repl., Doc. 120, #3580). Likewise, her account about waking up during the assault appears inconsistent with Luke's wakeful, ambulatory state moments before entering her cell with Johnson as depicted on the video. (Def. Mot. for Summ. J., Doc 102, #2579). Moreover, Johnson argues, the video footage blatantly

contradicts Luke's claim that she was sexually assaulted because it fails to capture any images or sounds suggestive of sexual assault. (*Id.*).

The problem for Johnson is that the portion of the events depicted on the screen are not central to Luke's account. The alleged wrongdoing itself occurred *inside* the cell, which all agree is *not* depicted on the video footage. Whether other officers were, or were not, in the doorway at the time is not a material part of Luke's claim. And, the apparent discrepancy between Luke's claim that she woke up during the assault, as compared to her apparent wakefulness and ability to walk on the video footage, may be explained, Luke says, by the fact that she was taking Tegretol. She points to evidence that one side effect of that drug may be to induce seizures that cause a "continuous confusional awake state." (Pl. Opp., Doc. 112, #3450 (citing McKee Dep., Doc. 108, #3116)).

Accordingly, the Court finds that the video evidence does not "blatantly contradict" Luke's claim that Johnson sexually assaulted her. As Johnson appears to admit, there is no footage that shows what happened between Johnson and Luke when they were alone together in holding cell 1. (*See* Def. Repl., Doc. 118, #3579) ("Sergeant Johnson is off camera for approximately two minutes and thirty seconds…"). At most, the video blatantly contradicts *portions* of her testimony (like the two sets of boots). But "that does not permit the district court to discredit [her] entire version of the events." *Hanson*, 736 F. App'x. at 527 (quoting *Coble*, 634 F.3d at 870). In short, Johnson's arguments ultimately amount to various factual inferences favorable to Johnson that a jury might draw from what the video footage

22

does show. As before, the Court need not opine about the persuasiveness of those inferences. It is enough to note that Johnson's arguments ultimately go to Luke's credibility and to the believability of her account, rather than to the existence of a genuine dispute of material fact. As such, they are not a basis for disregarding the entirety of Luke's testimony and granting summary judgment to Johnson.

As for "sounds of an assault," the Sixth Circuit has similarly considered that "[t]he lack of sound on an audio recording cannot be reliably used to discount [the plaintiff's] testimony." *Coble*, 634 F.3d. at 869. The Sixth Circuit reasoned that "[m]any factors could affect what sounds are recorded, including the volume of the sound, the nature of the activity at issue, the location of the microphone, whether the microphone was on or off, and whether the microphone was covered." *Id*. Johnson does not address these factors in his Motion for Summary Judgment, nor does Johnson develop the argument from absence of sound beyond merely mentioning it in support of the more general argument that the footage blatantly contradicts Luke's account. At oral argument, Johnson did refer to some other instances where the audio captured exchanges among inmates and officers in the booking area. Nevertheless, for the Court to rely on the claimed absence of audio suggestive of sexual assault would require the Court to assume that any sexual assault of Luke by Johnson necessarily would have made sounds that the audio portion of the video evidence would have captured. That factual assumption would not be appropriate at the summary judgment stage, at least in the absence of a more developed record and briefing regarding the issue.

For these reasons, the Court finds that neither the video nor the audio footage in the record blatantly contradicts Luke's claim that Johnson sexually assaulted her in a holding cell.

Because Luke's testimony in combination with other evidence in the record would be sufficient to create a genuine dispute of material fact in the absence of blatant contradiction by video evidence, and because the Court has determined that there is no such blatant contradiction in this case, the Court concludes that there is a genuine dispute of material fact as to whether Johnson sexually assaulted Luke that precludes summary judgment.

## D. Johnson Has Not Established A Defense Of "Qualified Immunity" Or Statutory Immunity.

Separately, Johnson repeatedly and prominently invokes the concept of "qualified immunity" in support of his Motion for Summary Judgment. (*See* Def. Mot. for Summ. J., Doc. 102, #2574). That is puzzling. As should be clear by now, the live dispute in this case concerns whether Johnson sexually assaulted Luke. If a factfinder were to determine that Johnson in fact did so, it is difficult to imagine how qualified immunity, a defense based on lack of clearly established law, could save him. As Plaintiff notes, the principle that sexual assault by an officer violates constitutional rights is about as clearly established as it gets. *See, e.g., Rafferty v. Trumball Cnty., Ohio*, 915 F.3d 1087, 1095 (6th Cir. 2019). On the other hand, if a factfinder were to determine that Johnson did not commit the alleged sexual assault, then Johnson would not need (or receive) qualified immunity, rather he would win on the merits.

24

At oral argument, Johnson's counsel clarified that Johnson is not claiming that he is entitled to qualified immunity if he in fact assaulted Luke. Rather, his only "qualified immunity argument" was that the undisputed facts show that he did not do so. For the reasons just discussed, this argument does not sound in qualified immunity. Thus, the Court finds that Johnson is not entitled to summary judgment based on the affirmative defense of qualified immunity.

The same logic applies to Johnson's argument against Luke's state-law battery claim based on Ohio statutory immunity. In his Motion, Johnson argues that he would be entitled to statutory immunity because he "did not act maliciously, wantonly, recklessly, or in bad faith." (Def. Mot. for Summ. J., Doc. 102, #2590 (citing Ohio R.C. § 2744.03(A)(6)(a)–(c)). But again, that all depends on whether the factfinder concludes by a preponderance of the evidence that Johnson sexually assaulted Luke. If no, then Johnson needs no further defense. If yes, then the Court struggles to see how such sexual assault would not be (for example) "malicious," "wanton," or "in bad faith," under the Ohio statute, at least absent more significant development of this argument than Johnson provides in his briefing. The Court therefore rejects the argument that Johnson is entitled to summary judgment on his state-law battery claim based on Ohio's immunity statute.

## E. Johnson Has Not Established His Statute-of-Limitations Defense With Respect to Plaintiff's Excessive Force Claim.

Finally, Johnson argues that some of Luke's claims are barred by the statute of limitations because they were not alleged in her complaint in the earlier action filed in 2015. (Def. Mot. for Summ. J., Doc. 102, #2586–87). Luke has indicated,

however, that she will drop all but one of the claims to which this argument applies, including any remaining official capacity claims. (Pl. Opp., Doc. 112, #3454–55). Accordingly, Luke's excessive force claim against Johnson in his individual capacity is the only live claim to which this argument pertains. (Pl. Opp., Doc. 112, #3455).

Johnson argues that the excessive force claim is barred by the two-year statute of limitations in Ohio Revised Code § 2305.10. (Def. Mot. for Summ. J., Doc. 102, #2586). He concedes that, under Ohio's saving statute, the excessive force claim would relate back to the filing of the original complaint (and thus be timely) if the two suits are "substantially the same." (*Id.* at #2587). But he claims that standard is not met here because the 2015 complaint sued Johnson (along with all the other defendants) solely in their individual capacities, while the operative Complaint in this case sues all defendants in both their individual and their official capacities. Johnson correctly notes that an official-capacity suit amounts to a claim against the defendant's employer—here, Warren County. (*See id.* at #2586 (citing *Alkire v. Irving,* 330 F.3d 802, 810 (6th Cir. 2003))). And, adding a new defendant, Johnson further argues, means that, as a matter of law, the two actions are not "substantially the same." (*Id.* at #2587).

As a general matter, two suits are "substantially similar" for purposes of Ohio's relation-back statute if the claims set forth in the second suit arise out of the same operative facts as the claims in the first suit, and the nature of the claims in the first suit suffice to put the defendant on notice. *See Stone v. N. Star Steel Co.*, 786 N.E.2d 508, 512 (Ohio Ct. App. 2003) ("A new complaint is substantially the same as the

26

original complaint for purposes of the saving statute when the new complaint differs only to the extent that it adds new recovery theories based upon the same factual occurrences …"). Johnson is correct that adding a new party generally means that the suits are not substantially similar for relation-back purposes, but that principle applies to the party that is added, not the parties who were already present in the previous suit. *See Eaves v. Strayhorn*, No. 1:09-cv-00394, 2010 WL 2521449, at *8 (S.D. Ohio June 15, 2010) (defendants sued only in official capacity in first suit could not be sued in individual capacity in subsequent suit, but statute of limitations did not bar the second suit's official capacity claims). The idea is that a claim against Party A would not necessarily put Party B on notice of the suit. Thus, Warren County could rely on that principle to resist being added to this new suit. But Luke has agreed to drop her official-capacity claims, meaning she is not objecting to Warren County's dismissal. (Pl. Opp., Doc. 112, #3454–55). Accordingly, the new-party principle has little operative effect here.

In terms of the claims against Johnson, the excessive force claim arises out of exactly the same set of facts on which the earlier sexual assault claim is based. Moreover, the damages, if any, presumably would be identical. Thus, the new claim is substantially similar to the previous claims, and it relates back.

In any event, ruling one way or the other has little practical import here. As noted, the excessive force claim and the sexual assault claim are essentially identical, both in terms of proof and of damages. If Luke succeeds on one, she would succeed on the other, and if she fails on one, she necessarily fails on the other. Accordingly, the

27

Court rejects Johnson's argument that the statute of limitations bars Luke's excessive force claim.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Johnson's Motion for Summary Judgment (Doc. 102) with respect to Luke's individual-capacity claims against Johnson arising out of alleged sexual assault. The Court **GRANTS** Johnson's motion with respect to all of Luke's claims not arising out of Johnson's alleged sexual assault, as well as any remaining official capacity claims against Johnson.

**SO ORDERED.**

September 29, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**